# 14-2487-cv

# United States Court of Appeals

*for the*

# Second Circuit

UFCW LOCAL ONE PENSION FUND
and its Trustees
FRANK C. DeRISO, JOHN P. BARRETT,
ERIC GLATHAR, RAYMOND WARDYNSKI,
ROBERT BOEHLERT, and KRISTINE WYDRO,

*Plaintiffs-Appellants*,

– v. –

ENIVEL PROPERTIES, LLC,

*Defendant-Appellee*,

15 McFADDEN ROAD, INC.,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## APPELLANTS' BRIEF AND SPECIAL APPENDIX

SLEVIN & HART, P.C.
Barry S. Slevin, Esq.
Jeffrey S. Swyers, Esq.
Paul E. Knupp, III, Esq.
1625 Massachusetts Ave. NW, Ste. 450
Washington, DC 20036
(202) 797-8700

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

As required by Rule 26.1, Appellants state that the United Food and Commercial Workers Local One Pension Fund is a jointly administered multiemployer employee benefit plan.  Accordingly, it has no stock and no parent corporations, nor does any corporation own more than 10% of its stock.

## Table of Contents

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES.................................................................iv

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES........................................................... 2

STATEMENT OF THE CASE .............................................................. 3

    A.   The Nature of the Case. ........................................................ 3

    B.   The Statutory Framework. .................................................... 3

STATEMENT OF FACTS.................................................................... 5

    1.   Empire Beef's Complete Withdrawal. ................................... 5

    2.   Course of Proceedings And Decision Below........................... 6

    3.   The Trial Record Regarding Enivel Properties LLC. ............. 7

SUMMARY OF THE ARGUMENT ...................................................... 13

ARGUMENT ..................................................................................... 14

I.     APPLICABLE STANDARDS OF REVIEW................................... 14

II.    THE DISTRICT COURT ERRED AS A MATTER OF
       BOTH LAW AND FACT IN FINDING THAT ENIVEL
       PROPERTIES LLC WAS NOT A TRADE OR BUSINESS
       UNDER THE MPPAA................................................................ 15

    A.   THE *GROETZINGER* TEST................................................. 15

    B.   THE DISTRICT COURT ERRED AS A MATTER OF
         LAW IN HOLDING THAT ENIVEL'S PRIMARY
         PURPOSE WAS NOT FOR PROFIT. ................................. 17

        (1)  The District Court Committed Clear Legal And
            Factual Errors By Ignoring Enivel's Multiple
            Admissions In The Record Regarding Its
            Profit Purpose. ............................................................. 19

        (2)  The District Court Committed Clear Legal
            Error By Concluding That An "Investment"
            Was Not For Profit. .......................................................21

C.  THE DISTRICT COURT ERRED AS A MATTER OF
    BOTH LAW AND FACT IN HOLDING THAT ENIVEL
    LACKED REGULARITY AND CONTINUITY. ...................25

    (1)  The District Court Committed Clear Error By
         Disregarding Enivel's Form And Activities As
         A Separate Legal Entity...............................................27

    (2)  Even Without Enivel's Status As A Formal
         Business Entity, Enivel's Real Estate Activities
         Alone Were Dispositive Because They Exceeded
         Mere Ownership. ...........................................................34

CONCLUSION ....................................................................................39

CERTIFICATE OF COMPLIANCE.......................................................40

## Table of Authorities

**Cases**                                                     **Page**

*Alvary v. United States,*
302 F.2d 790 (2d Cir. 1962)................................................................35

*Brown & Williamson Tobacco Corp. v. Pataki,*
320 F.3d 200 (2d Cir. 2003)...............................................................33

*Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC,*
760 F.3d 745 (7th Cir. 2001) .............................................................16

*Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC,*
2012 U.S. Dist. LEXIS 180867 (N.D. Ill. 2012) ...............................33

*Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson,*
238 F.3d 891 (7th Cir. 2001) ................................ 22, 26, 30, 31, 32, 33, 35

*Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC.,*
706 F.3d 874 (7th Cir. 2013) ..............................................................25

*Cent. States, Se. & Sw. Areas Pension Fund v. Personnel, Inc.,*
974 F.2d 789 (7th Cir. 1992) ...................................................16, 17, 18

*Cent. States, Se. & Sw. Areas Pension Fund v. Ray C. Hughes, Inc.,*
2012 U.S. Dist. LEXIS 60118 (N.D. Ill. 2012) .... 17, 18, 23, 26, 27, 28, 36

*Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC,*
668 F.3d 873 (7th Cir. 2011) ..................................... 18, 20, 27, 28, 30, 35

*Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC,*
738 F. Supp. 2d 840 (N.D. Ill. 2010).......................................................31

*Cent. States, Se. & Sw. Areas Pension Fund v. White,*
258 F.3d 636 (7th Cir. 2001) ...........................................................20, 21

iv

*Comm'r of Internal Rev. v. Groetzinger*,
480 U.S. 23 (1987) ........................................................................... *passim*

*Connors v. Incoal, Inc.*,
995 F.2d 245 (D.C. Cir. 1993) ......................................... 15, 16, 17, 19, 28

*Connors v. Hi-Heat Coal Co., Inc.*,
772 F. Supp. 1 (D.D.C. 1991) ...................................................................23

*Corbett v. MacDonald Moving Servs. Inc.*,
124 F.3d 82 (2d Cir. 1997) ......................................................................15

*Diebold Found., Inc. v. Comm'r*,
736 F.3d 172 (2d Cir. 2013) ............................................................15, 29

*Fackler v. Comm'r*,
133 F.2d 509 (6th Cir. 1943) ..................................................................37

*Harrell v. Eller Mar. Co.*,
2010 U.S. Dist. LEXIS 104826 (M.D. Fl. 2010) ...............................22, 35

*ILGWU National Retirement Fund v. Minotola*,
1991 U.S. Dist. LEXIS 6147 (S.D.N.Y. 1991) .........................................16

*Int'l Painters & Allied Trades Ind. Pension Fund v. KKB, LLC*,
421 F. Supp. 2d 71 (D.D.C. 2006) ....................................22, 23, 25, 35, 38

*McDougal v. Pioneer Ranch L.P.*,
494 F.3d 571 (7th Cir. 2007) .................................................. 17, 18, 19, 28

*Moline Props., Inc. v. Comm'r*,
319 U.S. 436 (1943) ..........................................................................21, 35

*Nat'l Pension Plan of the UNITE HERE Workers Pension Fund v. Swan Finishing Co.*,
2006 U.S. Dist. LEXIS 28281 (S.D.N.Y. 2006) .......................................16

*NYSA-ILA Pension Trust Fund v. Lykes Bros.,*
1997 U.S. Dist. LEXIS 11869 (S.D.N.Y. 1997) ....................................... 16

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.,*
467 U.S. 717 (1984) ...................................................................................... 4

*S.E.C. v. W. J. Howey Co.,*
328 U.S. 293 (1946) ..................................................................................... 22

*Sun Capital Partners III, LP v. New England Teamsters & Trucking*
*Indus. Pension Fund*, 724 F.3d 129 (1st Cir. 2013) ...................... 4, 26, 36

*Swift v. Taxation Div. Dir.,*
443 A.2d 1132 (N.J. Tax 1982) ................................................................. 37

*U.S. v. Akinrosotu,*
637 F.3d 165 (2d Cir. 2011) ...................................................................... 10

*U.S. v. Combs,*
30 F.3d 310 (2d Cir. 1994) ........................................................................ 33

*White v. White Rose Food,*
237 F.3d 174 (2d Cir. 2001) ...................................................................... 24

*Crown Cent. Petroleum Corp. v. Cosmopolitan Shipping Co.,*
602 F.2d 474 (2d Cir. 1979) ...................................................................... 39

**Statutes**

28 U.S.C. § 1291 ........................................................................................... 1

28 U.S.C. § 1331 ........................................................................................... 1

28 U.S.C. § 1337 ........................................................................................... 1

29 U.S.C. § 1001 ........................................................................................... 1

29 U.S.C. § 1301 ........................................................................................... 4

29 U.S.C. § 1381 ................................................................... 3

29 U.S.C. § 1383 ................................................................ 3, 5

29 U.S.C. § 1391 ................................................................ 4, 5

29 U.S.C. § 1399 ................................................................ 4, 5

## JURISDICTIONAL STATEMENT

The United Food and Commercial Workers Local One Pension Fund (the "Fund") brought a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1453. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 (federal question and commerce, respectively). The District Court denied the Fund's claim following a bench trial and entered judgment for the Defendant-Appellee on June 16, 2017. On July 8, 2014, the Fund filed its Notice of Appeal from final judgment within the time required by Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES

1) Where the defendant is a formal business entity, its organizational documents state that its purpose is to conduct business and provide for a division of profits, and it stipulated that its objective is to realize a profit, whether the district court erred as a matter of law by holding that the profit-or-income purpose element of the "trade or business" test in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987) is not satisfied.

2) Where the defendant is a formal business entity, its organizational documents state that its purpose is to conduct business and provide for a division of profits, it stipulated that its objective is to realize a profit, and in light of the stipulations and evidence presented at trial regarding the defendant's operations and activities, whether the district court's factual determination that the primary purpose of the defendant was not for profit is clearly erroneous.

3) Where the defendant is a formal limited liability company and engaged in numerous activities, including but not limited to, establishing and maintaining its formal business form, buying and marketing real estate for sale, and leasing real estate, whether the district court erred as a matter of law in applying an analysis of the regular-and-continuous element of *Groetzinger*'s "trade or business" test that required proof of the time spent annually on each activity.

4) Whether the district court's factual determination that the defendant's activities were not regular and continuous under the regular-and-continuous element of *Groetzinger* is clearly erroneous in light of the stipulations and evidence presented at trial.

2

## STATEMENT OF THE CASE

### A.    The Nature of the Case.

This action involves a claim by Plaintiff-Appellant UFCW Local One Pension Fund (the "Fund"), a joint labor-management defined-benefit pension fund, to collect "withdrawal liability" arising from the complete withdrawal from the Fund in November 2007 by Defendant-Appellee Enivel Properties, LLC's ("Enivel") controlled group member, Empire Beef Co., Inc. ("Empire Beef") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1453.

### B.    The Statutory Framework.

The MPPA provides that when "an employer withdraws from a multiemployer plan in a complete withdrawal ..., then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a).  A "complete withdrawal" occurs when an employer's contribution obligation or covered operations permanently cease. 29 U.S.C. § 1383.  The withdrawal liability amount is the employer's proportionate share of vested but unfunded benefits of

3

plan participants and beneficiaries calculated in accordance with 29 U.S.C. § 1391(b), (c) or (d). 29 U.S.C. §§ 1381, 1391(a), 1399.

"The MPPAA was enacted by Congress to protect the viability of defined pension benefit plans, to create a disincentive for employers to withdraw from multiemployer plans, and also to provide a means of recouping a fund's unfunded liabilities." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 138 (1st Cir. 2013) (*citing Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720-22 (1984)). To support these objectives, the MPPAA imposes joint and several withdrawal liability on the withdrawn employer and all "trades or businesses (whether or not incorporated) which are under common control." 29 U.S.C. § 1301(b)(1).

Enivel conceded that the "common control" element was met and that Empire Beef and Enivel were a part of the same control group for purposes of the instant withdrawal liability. JA-52.[1] Thus, the only issue before the court below as to Enivel's liability was whether it was a "trade or business." *Id.*

---

[1] "JA-" citations refer to the Joint Appendix.

4

## STATEMENT OF FACTS

### 1. Empire Beef's Complete Withdrawal.

Until the date of its withdrawal from the Fund in 2007, Empire Beef was party to a collective bargaining agreement ("CBA") with UFCW District Union Local One that required Empire Beef to make monthly contributions to the Fund on behalf of covered employees. JA-47.

On or about November 17, 2007, Empire Beef ceased all operations and effected a "complete withdrawal" from the Fund within the meaning of ERISA Section 4203(a), 29 U.S.C. § 1383(a).  JA-48.  The Fund assessed withdrawal liability in the amount of $1,235,644.00, calculated pursuant to the "Rolling 5" method under 29 U.S.C. § 1391(c)(3) prescribed by the Fund's Withdrawal Liability Rules. JA-48.[2]  Empire Beef failed to make any payments and ultimately defaulted pursuant to Section 4219(c)(5)(A) of ERISA, 29 U.S.C. § 1399(c)(5)(A).  JA-49.

On February 6, 2009, the Fund filed a lawsuit against Empire Beef

_____

[2] Under the "Rolling 5" formula, an employer's proportional share of the Fund's unfunded vested benefits is based on the employer's share of the Plan contributions during the five years preceding the withdrawal.

5

in the United States District Court for the Northern District of New York. JA-49. On September 13, 2011, judgment was entered against Empire Beef for $1,790,343.90, an amount comprised of the principal withdrawal liability plus interest, liquidated damages, attorneys' fees, and costs. *Id.* Despite entry of judgment, Empire Beef has not paid any amount owed to the Fund. *Id.*

### 2. Course of Proceedings And Decision Below.

On September 26, 2011, the Fund filed this action in the United States District Court for the Northern District of New York (the "District Court") seeking a judgment for the withdrawal liability against Enivel as a member of the control group with Empire Beef. Given that Enivel conceded that it was under common control with Empire Beef at the time of Empire Beef's withdrawal, on October 17, 2012, the parties cross-moved for summary judgment on the issue of whether Enivel constituted a trade or business and thus was liable for Empire Beef's withdrawal liability. On August 14, 2013, the District Court issued an opinion analyzing the "trade or business" requirement under the two-prong framework developed in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987), where the Supreme Court

held that an activity is a "trade or business" if it is engaged in (1) for the primary purpose of income or profit; and (2) with continuity and regularity. The District Court found that there existed genuine issues of material fact on both elements and denied the cross-motions. JA-10.

The case proceeded to a bench trial held by Judge Glenn T. Suddaby on April 7, 2014. The parties filed post-trial briefs on June 6, 2014. On June 16, 2014, Judge Suddaby issued the Decision and Order for entry of final judgment in favor of Enivel. SPA-1.[3] The Fund filed its notice of appeal on July 8, 2014. JA-389.

### 3. The Trial Record Regarding Enivel Properties LLC.

The issue at trial was limited to the issue of whether Enivel was a "trade or business" under the two-prong *Groetzinger* test. Most of the facts in the record for trial were submitted through a stipulation of facts (the "Joint Stipulation"), included in the Joint Appendix at JA-46.

In the Joint Stipulation, Enivel stipulated that it was a New York Limited Liability Company ("LLC") and that "Enivel's objective is to buy properties and later sell them at a higher price, realizing a profit." JA-49–JA-50. Enivel was formed on May 27, 2003 for the purpose stated in its Operating Agreement "to conduct any lawful business." JA-50. Lori

---

[3] "SPA-" citations refer to the attached Special Appendix.

7

Levine, a business school graduate and now licensed real estate broker, was Enivel's managing partner responsible for controlling and conducting "the Company's business." JA-50.

Ms. Levine testified that the purpose of Enivel was to buy real estate for resale at a profit. JA-83. Enivel's Operating Agreement required annual allocation to its Members, Steven Levine and Lori Levine, of the "net profits and net losses of the Company," and shielded them against personal liability "for the expenses, liabilities, or obligations of the Company." JA-135, JA-141. Leading up to and during the year of Empire Beef's withdrawal in late 2007, Enivel entered into service contracts with attorneys, accountants, professional bookkeepers, and maintenance personnel to maintain the LLC's operational status and partnership tax treatment. JA-50, JA-51, JA-86, JA-91, JA-92, JA-95, JA-98, JA-172.

In June 2003, Enivel applied for and the IRS issued to Enivel a Federal Employer Identification Number to "identify [its] business account, tax returns, and documents." JA-50, JA-96, JA-154. Enivel opened a Business Checking account at Key Bank. JA-50, JA-91. In July 2004, it amended its LLC Articles of Organization registration

8

with the New York Department of State to change its address for service of process from that of Empire Beef to that of an office suite leased by its Manager, Lori Levine.  JA-96, JA-152.

To operate the LLC, Enivel retained an accountant to set up accounting software that Enivel used to manage its finances, and retained "various [other] bookkeepers" to prepare its taxes.  JA-50, JA-91, JA-92.  Enivel purchased registration certificates for an official internet domain name (*i.e.* www.enivelproperties.com) and approximately twenty variations of domain names containing the word "Enivel."  JA-120, JA-121.  Ms. Levine testified that this was done to "monopolize that name."  JA-121.  When conducting property-related email correspondence, Ms. Levine sent and received messages using an address bearing Enivel's main domain name (*i.e.* lori@enivel-properties.com).  JA-120.

Ms. Levine obtained her real estate agent's license in 2008 "shortly after Empire Beef closed down" and her real estate broker's license within the subsequent year.  JA-79.  She admittedly relied upon Enivel's real estate activities during 2007 to meet the minimum level of "experience" required to apply for a professional broker's license.  JA-80.

9

As an applicant who did not possess two years of full-time work as a licensed realtor at the time she submitted her application in 2009, Ms. Levine was required to possess "at least 3 years of experience in the real estate business equivalent to that of an active real estate salesperson."[4]

When Empire Beef withdrew on November 17, 2007, the Levines had contributed approximately $250,000 into Enivel with which the Company acquired three properties: (1) a 42-acre parcel of land on Ogden Center Road, in Spencerport, New York ("Ogden Property") pre-zoned for 32 residential lots; (2) a 5.2-acre undeveloped parcel of land on Mildahn Road, in Walworth, New York ("Mildahn Property"); and (3) a condominium on East Avenue, in Rochester, New York ("East Avenue Condo") in May 2007. JA-50, JA-172, JA-175. As of 2007, Ms. Levine was marketing the Mildahn Property for sale through direct marketing, publishing advertisement listings on the realty website "LoopNet," and listing the property for sale with other real estate brokers. JA-51, JA-113, JA-114, JA-116. Ms. Levine would "promote it any way [she] could to see if [she] could get a buyer" using the same methods that she

---

[4] N.Y. Dept. of State Div. of Licensing Svcs.: *Real Estate Broker Application* (*available at* http://www.dos.ny.gov/forms/licensing/0036-a-f.pdf); NY CLS Real P. § 441. The Court may take judicial notice of state licensure requirements. *U.S. v. Akinrosotu*, 637 F.3d 165, 168 (2d Cir. 2011).

currently uses to market properties in her capacity as a professional real estate broker. JA-113. Also prior to Empire's withdrawal, Ms. Levine researched and identified properties for purchase by Enivel using her connections with real estate brokers and by researching and monitoring real estate listings on the internet. JA-50. The Company's goal was to realize a profit by transacting in real estate. JA-50, JA-83, JA-88.

Enivel leased its East Avenue Condo to short-term residential tenants from May 2007 through 2010, when the unit was sold. JA-50. Ms. Levine researched local market pricing to set the monthly rental rate. JA-108. To find potential tenants, Ms. Levine posted internet ad listings, to which interested individuals responded by contacting Ms. Levine directly. JA-107. They would schedule an appointment to view the condominium. JA-106. Ms. Levine personally showed the unit to prospective tenants and had them complete a rental application form. JA-106, JA-108. She would then contact the applicant's current employer to verify employment and income. JA-107. Approved tenants were required to sign a written month-to-month lease agreement with Enivel and pay a security deposit of one month's rent. JA-108. The

11

lease agreement obligated Enivel to repair anything in the unit that was not covered by the condominium association. JA-110. Tenants reported complaints and service requests directly to Ms. Levine, who handled necessary repairs and maintenance on behalf of Enivel by hiring contractors on an "as-needed" basis. JA-110, JA-111. A tenant planning to move out of the apartment was required to provide thirty days advanced notice to Ms. Levine, who would then reinitiate the process of advertising, meeting potential tenants, showing the property, obtaining and processing the rental application and contacting the potential tenant's employer; signing the lease, collecting the security deposit and rents, and overseeing complaints and repairs. JA-109. Despite a "considerable amount of turnover" in tenants from 2007 to 2010, Ms. Levine's efforts kept the condominium occupied by a tenant approximately 80% of the time. JA-50, JA-51, JA-105.

By the time of Empire's withdrawal from the Fund in November 2007, Enivel was fully engaged in the above rental activities. JA-105. Enivel filed a federal tax return for 2007 on a Form 1065 in which it reported gross real estate rental income of $6,055 and claimed deductions for expenses of $5,035 for, *inter alia*, legal and professional

12

fees, utilities, and depreciation. JA-175, JA-176. "Form 1065 is an information return used to report the income, gains, losses, deductions, credits, etc., from the operation of a partnership," which the IRS defines as "the relationship between two or more persons who join to carry on a trade or business."[5]

## SUMMARY OF THE ARGUMENT

The *Groetzinger* test that courts use when deciding whether an activity is a "trade or business" for purposes of withdrawal liability has two requirements: that it is engaged in (1) for the primary purpose of profit or income, and (2) with continuity and regularity. The District Court's ruling that neither requirement was met in this case was based upon a misapplication of the legal standard that the courts use to apply the *Groetzinger* test and thus should be reviewed *de novo*. The District Court also ignored undisputed dispositive facts in the record and thereby reached a result that is clearly erroneous.

With respect to the first *Groetzinger* requirement – primary purpose of profit – the trial court ignored Enivel's dispositive admissions in the record that its objective was to buy real estate and

---

[5] IRS Form 1065 Instructions *2 (2007) (*available at* http://www.irs.gov/pub/irs-prior/ il065—2007.pdf).

then resell it at a higher price for profit.  The District Court incorrectly held that an investment can be for something other than profit and confused the legal standards applicable to the profit-purpose requirement with those applicable to the regular-and-continuous requirement, which constitutes clear legal error and thus warrants *de novo* review of the District Court's erroneous resulting conclusion.

With respect to *Groetzinger*'s second requirement – continuity and regularity – the District Court ignored Enivel's status as a formal business entity and the regular and continuous activities that Enivel undisputedly undertook to establish, maintain and operate the legal entity.  Further, the District Court ignored undisputed real estate activities that dispositively confirm Enivel's continuity and regularity by imposing an improper time requirement on each activity.  This was a legal error that resulted in a conclusion that was clearly erroneous.

## ARGUMENT

## I.    APPLICABLE STANDARDS OF REVIEW.

On an appeal from a decision following a civil bench trial, this Court "reviews a district court's findings of fact for clear error, and its conclusions of law de novo; resolutions of mixed questions of fact and

law are reviewed de novo to the extent that the alleged error is based on the misunderstanding of a legal standard and for clear error to the extent that the alleged error is based on a factual determination." *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 182 (2d Cir. 2013). Here, the District Court's Decision & Order, which followed a bench trial, should be reviewed de novo with respect to the court's formulation and application of the legal standards for "trade or business" status under *Groetzinger* and for clear error with respect to factual findings, as discussed and indicated for each of the errors below.

## II. THE DISTRICT COURT ERRED AS A MATTER OF BOTH LAW AND FACT IN FINDING THAT ENIVEL PROPERTIES LLC WAS NOT A TRADE OR BUSINESS UNDER THE MPPAA.

### A. THE *GROETZINGER* TEST.

Under the MPPAA, an entity incurs joint and several liability for withdrawal liability owed to a pension fund under the MPPAA simply by being (1) a trade or business (2) under common control with the withdrawing employer. *Corbett v. MacDonald Moving Servs. Inc.*, 124 F.3d 82, 86 (2d Cir. 1997). No economic nexus with the withdrawn employer is required. *Connors v. Incoal, Inc.*, 995 F.2d 245, 250-51 (D.C. Cir. 1993) ["*Connors*"].

The MPPAA does not define the phrase "trade or business" but district courts in the Second Circuit have relied upon the Supreme Court's *Groetzinger* test for guidance. *See, e.g., ILGWU National Retirement Fund v. Minotola*, 1991 U.S. Dist. LEXIS 6147 (S.D.N.Y. 1991); *Nat'l Pension Plan of the UNITE Here Workers Pension Fund v. Swan Finishing Co.*, 2006 U.S. Dist. LEXIS 28281 (S.D.N.Y. 2006); *NYSA-ILA Pension Trust Fund v. Lykes Bros.*, 1887 U.S. Dist. LEXIS 11869, *15 (S.D.N.Y. 1997). Indeed most district courts use the *Groetzinger* test as the framework for a "trade or business" analysis. *Connors*, 995 F.2d at 250.

The Supreme Court held in *Groetzinger* that, to receive favorable income tax treatment as a trade or business, "a person must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Id.* "More specifically, when applying this test courts look to factors such as purpose, tax status, and legal form of the enterprise." *Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC*, 760 F.3d 745, 749 (7th Cir. 2014). *Groetzinger*'s dual inquiry is designed to differentiate a trade or business from "sporadic activity, a hobby, or an amusement diversion." *Cent. States, Se. and Sw.*

*Areas Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 794 (7th Cir. 1992)

(*quoting Groetzinger*, 480 U.S. at 35).

### B. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT ENIVEL'S PRIMARY PURPOSE WAS NOT FOR PROFIT.

In determining the first prong of the *Groetzinger* test, whether an activity is engaged in "for the primary purpose of income or profit," courts consider the facts in an attempt to distinguish "between operating for income or profit and operating for personal reasons"--*i.e.*, a hobby or a personal home. *Cent. States, Se. & Sw. Areas Pension Fund v. Ray C. Hughes*, *Inc.*, 2012 U.S. Dist. LEXIS 60118 (N.D. Ill. 2012) ["*Hughes*"]. The most relevant fact in this particular inquiry is "a defendant's stated intention of forming a business ... because it constitutes a declaration against interest." *McDougal v. Pioneer Ranch, L.P.*, 494 F.3d 571, 577–78 (7th Cir. 2007); *Connors,* 995 F.2d at 254. Where a defendant is a legal business entity, short of an admission by a defendant that the purpose of an activity is for profit, courts look to the documents forming the entity to glean its purpose. *See Hughes*, 2012 U.S. Dist. LEXIS 60118 at *13 (looking to defendant's articles of incorporation stating a purpose to "carry on a general trucking and

17

contracting business…"); *McDougal v. Pioneer Ranch*, 494 F.3d at 577–78 (looking to partnership agreement stating a purpose "to engage in the business of farming, ranching, and any agricultural pursuit or undertaking").

"[E]ven activity that does not produce a net gain, … can be for the primary purpose of income or profit where that activity increases equity, appreciates value, and generates tax deductions that reduce the overall tax burden." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC,* 668 F.3d 873, 878 (7th Cir. 2011) ["*SCOFBP*"] (internal quotations omitted); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Personnel, Inc.*, 974 F.2d at 795 (finding that deductions for expenses related to real estate activity were "strong evidence" that the real estate activities constituted a trade or business).

Here, the District Court held that the first *Groetzinger* prong was not satisfied, finding that Enivel's primary purpose was "personal" and that profit or income was a "secondary purpose."  SPA-15.  The court also ruled that the Fund needed to present evidence establishing the annual number of hours that Ms. Levine engaged in Enivel's real estate activities to prevent a finding that Enivel was merely a "personal

18

investment" and that its failure to do so was dispositive of *Groetzinger*'s primary purpose of profit requirement. SPA-14–SPA-15.

> ### (1) The District Court Committed Clear Legal And Factual Errors By Ignoring Enivel's Multiple Admissions In The Record Regarding Its Profit Purpose.

The record clearly demonstrated that the first *Groetzinger* factor was satisfied because, by Enivel's own admissions in the parties' Joint Stipulation and at trial, its purpose was to earn profit. Enivel stipulated the following admission into the record: "Enivel's objective is to buy properties and later sell them at a higher price, realizing a profit." JA-50. During the bench trial, Enivel Manager Lori Levine testified that Enivel was formed for the purpose of buying real estate to resell at a profit. JA-83. The record also contains Enivel's Operating Agreement, which is replete with provisions governing "Net Profits" and the allocation of "Net Profits" among the LLC's members. JA-135–JA-142. No evidence could be more probative of Enivel's purpose. *See McDougal v. Pioneer Ranch L.P.*, 494 F.3d at 577–78; *Connors,* 995 F.2d at 254.

The District Court ignored these multiple dispositive admissions of Enivel's purpose and the evidence of the stated purpose in its operational documents and instead attributed "personal reasons" to

Enivel's real estate activities.  SPA-15.  Although the District Court did not link its factual findings to any legal standards, it seems to give two purported premises for this finding.  One premise is the idea that "leasing real property to a tenant" can be "for the primary purpose of something other than the generation of income or profit." SPA-10 (*citing Cent. States Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 643 (7th Cir. 2001) ["*White*"]).  The second premise is that "holding onto real property as an 'investment'" can be for a primarily "personal" purpose "where the owner spends a 'negligible' amount of time managing the leases." *Id.* (*citing SCOFBP).*  Both lines of analysis fail.

First, the District Court erred in relying on *White* to find that the purpose of Enivel's activities could be "something other than the generation of income or profit."  SPA-10.  In *White*, the defendants were a husband and wife who had purchased a house for their primary residence that included two small apartment units above the garage which were being rented when the White's purchased the house. 258 F. 3d at 643.  The court found that the Whites' purpose for purchasing the property was as a primary residence and that their primary reason for maintaining the tenancies thereafter was the added sense of security

20

the tenants' presence gave Mrs. White when Mr. White was away for work travel. *Id.* The Whites were not a business entity with a stated profit purpose. The District Court's reasoning based on *White* disregarded the corporate form maintained by Enivel and effectively treated Enivel as the agent of the Levines, which impermissibly reverses the agency relationship between a business entity and its principals as a matter of law. A business entity and its purpose exist separately from its shareholders. *Moline Props., Inc. v. Comm'r*, 319 U.S. 436, 440 (1943) ("existence of a corporation with one or several stockholders, regardless of the corporation's business activities, does not make the corporation the agent of its stockholders"). Thus, the reasoning in *White* is inapplicable here.

> **(2)   The District Court Committed Clear Legal Error By Concluding That An "Investment" Was Not For Profit.**

Second, the District Court characterized all of Enivel's activities as "investments," but found that these investments had a "personal" purpose, a finding purportedly based on a lack of evidence as to how many hours Ms. Levine spent managing the investment activities. SPA-14–SPA-15. But there was no evidence or finding of any other purpose for Enivel's activities other than "investments." The District

Court found that Enivel's leasing of the East Avenue Condominium was intended "to offset the carrying costs of the investment," SPA-13, which falls under the definition given in the case law of a profit purpose. *Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, LLC*, 421 F. Supp. 2d 71, 75–76 (D.D.C. 2006) ["*KKB, LLC*"] (offsetting costs shows a profit purpose). Likewise, the only purpose that the District Court expressly found for the Mildahn Property and Ogden Property was "personal investment." SPA-14, SPA-15. The Levines did not form Enivel and direct its acquisition and leasing of properties for their own amusement or enjoyment; Enivel's properties were for investment purposes and there was no evidence to the contrary.

This simple finding defeats the District Court's conclusion on the first *Groetzinger* prong because investments are inherently for-profit. *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 298 (1946) (defining "investment" as "the placing of capital or laying out of money in a way intended to secure income or profit from its employment"). Indeed, even the mere "holding of investments 'will normally satisfy the first prong of *Groetzinger* since the purpose is to produce income . . .'" *Harrell v. Eller Mar. Co.*, 2010 U.S. Dist. LEXIS 104826, *10 (M.D. Fl. 2010) (*quoting*

22

*Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 896 (7th Cir. 2001) ["*Fulkerson*"]). Courts flatly reject the notion that leasing real estate investments for the asserted purpose merely "to collect enough rent to pay [ ] mortgage obligations" somehow negates the intrinsic for-profit purpose of the underlying investing activity, particularly where, as here, the company's tax return reports income from rental activity and claims deductions for property depreciation. *KKB, LLC*, 421 F. Supp. 2d at 75–76; *see also Connors v. Hi-Heat Coal Co., Inc.*, 772 F. Supp. 1, 6 (D.D.C. 1991). Thus, for example, a defendant's asserted purpose "to own and invest family estate assets rather than generate regular income or profit" has been deemed incapable of rebutting the fact that its primary purpose was income or profit. *Hughes*, 2012 U.S. Dist. LEXIS 60118 at *12. Real estate activity, in particular, "need not even produce a net gain for its primary purpose to be for income or profit because the activity could increase equity . . ." *Id.*

Additionally, the District Court's consideration of the number of hours Ms. Levine spent on each activity confused *Groetzinger*'s first requirement of purpose with its *second* requirement that an activity be

23

engaged in "with continuity and regularity." The second requirement (discussed in detail *infra* at II.C) is what distinguishes a passive "investment" activity (including the mere ownership of property) from a "trade or business" and thus what courts analyze where a defendant argues that its property ownership constitutes a passive "investment." Describing an investment as "personal," as the District Court did here, does not negate the fundamental profit *purpose* of investing and has no legal significance where, like here, no personal *purpose* other than investing has been asserted or found.

Despite Enivel's repeated admissions to a profit purpose (JA-50, JA-83, JA-88) as well as the evidence of Enivel's LLC operational document, which specifically speaks to the division of profits (JA-135, JA-141), the District Court held that in order to rebut a finding that Enivel was engaged in "investment" activity the Fund was required to prove the number of hours that Ms. Levine spent annually engaging in Enivel's various real estate activities, thus erroneously imposing this as a dispositive component of *Groetzinger*'s first prong. The Fund respectfully submits that the District Court's misunderstanding and misapplication of *Groetzinger*'s first requirement by itself warrants *de*

*novo* review by this Court and constitutes reversible legal error. *White v. White Rose Food*, 237 F.3d 174 (2d Cir. 2001) (reversing where district court's misconception of law was "linchpin" that tainted subsequent findings).

### C. THE DISTRICT COURT ERRED AS A MATTER OF BOTH LAW AND FACT IN HOLDING THAT ENIVEL LACKED REGULARITY AND CONTINUITY.

The second requirement of the *Groetzinger* test, that of continuous and regular activity, distinguishes a trade or business from a passive "investment" – which courts define as "possession … without more." *Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 881 (7th Cir. 2013).  An activity is performed with "regularity" if it is operated "constantly, continually, steadily, sustainedly, and if it is operated in a methodical way." *KKB, LLC*, 421 F. Supp. 2d at 76.

The District Court incorrectly held that the second *Groetzinger* prong was not satisfied because it found that Enivel's activities were "interrupted and/or sporadic." SPA-18.  It further incorrectly held that the Fund needed to establish the number of hours that Ms. Levine spent engaging in Enivel's real estate activities each year and that its failure to do so was dispositive. SPA-16, SPA-17.  The District Court's

reasoning, favorably construed, seems to be that Enivel ultimately was nothing more than a holding company for passive personal investments, a characterization that the District Court purported to base on the "negligible" time Ms. Levine spent carrying out Enivel's various real estate activities. SPA-10.

"A mere investment made to make a profit, without more, does not itself make an investor a trade or business." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d at 141–42. Contextually, the "[m]ere possession of property without more does not establish continuous and regular activity." *Hughes* at *14 (*citing Fulkerson*, 238 F.3d at 895–96). Instead, "[c]ourts look at actions taken related to the property, such as negotiating leases, researching properties, and maintaining or repairing properties." *Id.*

The evidence in this case undisputedly showed that Enivel was not engaged in "mere possession of property without more" for two independent reasons. First, Enivel's status and activities as a formal business entity demonstrate that its activities were not those of a passive investor. Second, the undisputed facts establish specific real estate activities performed by Enivel as to the properties it owned that

26

also exceed mere ownership and readily distinguish it from a passive investor. Each reason could and should have been dispositive by itself; their combination here makes Enivel's trade or business status undeniable.

### (1) The District Court Committed Clear Error By Disregarding Enivel's Form And Activities As A Separate Legal Entity.

While courts tasked with deciding whether a formal business entity is a "trade or business" under the MPPAA still approach that determination under *Groetzinger*'s framework, they agree that, in practice, continuity and regularity will virtually always be found because of the routine formalities and tasks inherent in forming and continually maintaining the separate legal entity. *SCOFBP, LLC,* 668 F.3d at 878–79; *Hughes*, 2012 U.S. Dist. LEXIS 60118 at *16–20. As the Seventh Circuit stated, "[b]ecause formal business organizations ordinarily operate with continuity and regularity and are ordinarily formed for the primary purpose of income or profit, it seems highly unlikely that a formal for-profit business organization would not qualify as a 'trade or business' under the *Groetzinger* test." *SCOFBP, LLC,* 668 F.3d at 878-79. Indeed, neither Enivel in its briefing below, nor the

27

District Court in its written opinion, cited to any case where a court held that a formal business entity such as Enivel was not a "trade or business" under the MPPAA.

The specific activities that cause a formal business entity to have the requisite regularity and continuity are: organizing and forming the legal business entity; obtaining a Federal Employer Identification Number; contracting with professionals to provide legal management and accounting services; filing tax returns for the business entity; and claiming business-related expenses as income tax deductions. *Hughes*, 2012 U.S. Dist. LEXIS 60118 at *16–20; *SCOFBP, LLC*, 668 F.3d at 878–79. Courts find that these activities satisfy the second *Groetzinger* prong standing alone. *Id.* "[P]arties are responsible for whatever legal consequences attach to their own choice of business organization." *Pioneer Ranch*, 494 F.3d at 578; *Connors,* 995 F.2d at 254; *Hughes*, 2012 U.S. Dist. LEXIS 60118 at *20.

Here, the evidence was undisputed that Enivel exhibited all of the requisite activities and characteristics to confirm its status as a trade or business: Enivel was formed and continuously maintained as a for-profit limited liability company and earned real estate rental income,

28

JA-135–JA-155, claimed business-related deductions on its federal income tax returns, JA-51, JA-175, applied for and possessed a Federal Employer Identification Number, JA-50, JA-96, and contracted with professionals for legal and accounting services, JA-50, JA-51, JA-86, JA-91, JA-92, JA-95, JA-98, JA-112.

But in the decision below, the District Court overlooked the existence of Enivel's status and activities as a formal business entity and the undisputed evidence proving each of these factors, and failed to even address their presence or relevance. *See* SPA-16–SPA-18. This is clear error. *See, e.g.*, *Diebold Found., Inc. v. Comm'r*, 736 F.3d at 188 (vacating judgment of lower court which "did not sufficiently address the totality of the circumstances from all of the facts").

Instead, in finding that Enivel did not engage in activity with the requisite continuity and regularity, the District Court purported to rely upon two Seventh Circuit decisions quoted in the written opinion for the proposition that the duration and frequency of activities needed to be proved. SPA-10. This reliance was misplaced. First, the District Court quoted the Seventh Circuit's statement in *SCOFBP, LLC* that "[o]wning property can be considered a personal investment, at least where the

29

owner spends a negligible amount of time managing the leases ....” 668 F.3d at 878–79.  SPA-10.  However, the undisputed facts in the case are that Enivel was the owner of the properties at issue, not the Levines. JA-50, JA-85.  And, the *SCOFBP, LLC* court held that the defendant was a trade or business based on its attributes and activities as a formal business entity.  668 F.3d at 877–79.  Moreover, the quoted statement in *SCOFBP*, *LLC* merely appeared in the context of the Seventh Circuit’s summarization of its prior holding in *Fulkerson* -- the second case cited by the District Court in support its proposition that the amount of time spent is a dispositive requirement. SPA-10.

*Fulkerson* is clearly inapposite because it did not involve a defendant that was a formal business entity.  In *Fulkerson*, the defendants were a husband and wife who leased a property that they personally owned. 238 F.3d at 893.  The plaintiff alleged that the leasing constituted an unincorporated trade or business.  *Id.*  Because the property was not owned by a formal business entity, the court was forced to look for a pattern of related overt activity among all of the activities engaged in by the owners in order to determine whether this “informal economic activity” was “personal” or instead amounted to an

30

unincorporated business. *Fulkerson*, 238 F.3d at 895 (deeming that a "thorny question"); *see also White*, 258 F.3d at 643 (the Whites' "activities did not benefit a trade or business that could be easily separated from the normal maintenance and upkeep that every homeowner performs ... for their primary residence").  The same does not hold true when attempting to determine the existence of a "trade or business" that has already organized as a formal business entity like Enivel, the operations of which are methodical and easily discerned. Indeed, the *Fulkerson* court observed that the analysis that applies to a formally recognized business organization, in contrast to an individual, "presents no interpretive difficulties." *Id.*

The Seventh Circuit itself made this critical distinction clear in *SCOFBP, LLC* (the other case cited by the District Court in support of its holding, SPA-10).  There, the defendant-appellant MCRI, an Illinois LLC, argued that it should be deemed a passive personal investment analogous to the individual owners in *Fulkerson* because the owner spent virtually no time engaging in activities regarding the real estate investment holdings. *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 738 F. Supp. 2d 840, 850 (N.D. Ill. 2010).  Rejecting this

31

argument, the Seventh Circuit stated that *Fulkerson* had "tested the outer bounds of the 'personal investment concept," and affirmed MCRI's trade or business status based on the following factors, none of which included a time spent requirement: (1) MCRI was a for-profit limited liability company; (2) MCRI earned rental income from a third-party lessee (not the withdrawing employer), paid business management fees, and claimed business-related deductions on its federal income tax returns; (3) MCRI possessed a Federal Employer Identification Number; (4) MCRI had no employees, but contracted with professionals to provide legal, management, and accounting services; and (5) MCRI's operating agreement stated that its primary purpose was generating income or profit, specifically "to hold real estate and investments approved by the Manager." 668 F.3d at 877, 879. Each of these facts were undisputedly established as to Enivel as demonstrated in the record. JA-49, JA-50, JA-51, JA-86, JA-91, JA-92, JA-95, JA-96, JA-98, JA-135, JA-172, JA-175.

More recently, another LLC defendant also contended that it was a passive real estate investment holding company whose owner spent less than ten hours per year engaged in activities and relied on the same

32

quote from *Fulkerson* that the District Court relied upon here. *Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC*, 2012 U.S. Dist. LEXIS 180867, *23 (N.D. Ill. 2012). In rejecting this argument and holding that the LLC satisfied the *Groetzinger* test as a trade or business, the district court stated:

> … [T]he LLC defendants are not individuals but formal business entities which, based on the evidence, lease property or equipment, file tax returns, report rental revenue and paid outside contractors, legal and otherwise, to manage them. As detailed above, these facts establish that they are trades or businesses.

*Id.* at 24, *aff'd*, 760 F.3d 745 (7th Cir. 2014).

Thus, the District Court's insistence on a time requirement erroneously relied on *Fulkerson* and misapplied the *Groetzinger* test to an undisputed formal business entity. Accordingly, this Court can and should exercise *de novo* review, vacate, and reverse. *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 210 (2d Cir. 2003) (reversing findings predicated on case law that was "easily distinguishable"); *U.S. v. Combs*, 30 F.3d 310, 317 (2d Cir. 1994) (bench trial findings warrant plenary review and reversal when "derived from legally impermissible factors, the failure to consider legally relevant

33

factors, the application of incorrect legal standards, or the misapplication of correct legal standards").

> **(2)    Even Without Enivel's Status As A Formal Business Entity, Enivel's Real Estate Activities Alone Were Dispositive Because They Exceeded Mere Ownership.**

Even putting aside the evidence of Enivel's formal business status and the activities commensurate with such status, Enivel engaged in specific types of activity found by the District Court that foreclose it from being classified as a passive investment as a matter of law.

Specifically, the Fund proved, and the District Court indeed found, that Enivel was directly involved with its holdings beyond mere ownership in several respects, all of which were disregarded by the District Court in the absence of a demonstration of the number of hours each discrete type of involvement entailed. But the showing of these activities did not require more to establish that *Groetzinger*'s second prong was satisfied, and the District Court erred by going beyond those findings to consider the duration and frequency of each activity in isolation.

First, the Fund showed, and the District Court found, several ongoing marketing activities undertaken by Enivel with regard to its

Mildahn Property and Ogden Property, including direct marketing to realtors, retention of third-party brokerage firms, internet and website advertising, and cold calls to land developers. JA-51, JA-113; SPA-7, SPA-14, SPA-15, SPA-16. "While mere ownership of a property is not enough to constitute regular and continuous conduct, 'activities taken with regard to the property … are regular and continuous trade or business conduct.'" *KKB, LLC*, 421 F. Supp. 2d at 77 (*quoting Fulkerson*, 238 F.3d at 896).

Moreover, and independently, Enivel's management and leasing of the East Avenue Condominium were functions of a landlord – not a mere investor – and thus independently established *Groetzinger*'s first prong. Real estate leasing is "an unambiguous business venture." *Moline Properties, Inc. v. Comm'r*, 319 U.S. at 440.

Courts analyzing a defendant with real estate holdings look to "activities taken with regard to the property" to establish regularity and continuity. *Fulkerson*, 238 F.3d at 895–96; *Harrell v. Eller Mar. Co.*, 2010 U.S. Dist. LEXIS 104826 at *10. Action directed towards a single property will suffice because it exceeds "mere ownership." *SCOFBP, LLC,* 668 F.3d at 878; *Fulkerson*, 238 F.3d at 895; *see also Alvary v.*

35

*United States,* 302 F.2d 790, 796 (2d Cir. 1962); *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d at 133–34 (investment holding company was a trade or business due to direct involvement with asset).

When a leasing activity is involved, "it is appropriate to consider all of the actions taken on behalf of the landlord," including those performed by its managers, hired professionals, and other agents "to fulfill the landlord's duties under the lease." *Hughes*, 2012 U.S. Dist. LEXIS 60118 at *20. Such activities include negotiating leases, receiving rent checks, making deposits, furnishing information to tax preparers, handling tenant requests, receiving tenant phone calls; and locating and corresponding with contractors to do maintenance work, the performance of which demonstrate active involvement beyond that of mere ownership of the property. *Id.* Relying on a Sixth Circuit decision that held that an individual employed full-time as an attorney was nonetheless engaged in a trade or business of residential real estate for tax purposes because of his obligations as a landlord, a tax court aptly identified the distinction between a passive investor and one engaged in a trade or business in the real property context:

36

> If property is leased to a single tenant under a long-term net lease which requires the tenant to provide all operational and management services, the owner who merely receives the net rental is a passive investor. If property is leased to many tenants under short-term gross leases where the landlord directly or indirectly provides operational and management services, the owner is engaged in a trade or business.

*Swift v. Taxation Div. Dir.*, 443 A.2d 1132, 1135 (N.J. Tax 1982) (*citing Fackler v. Comm'r*, 133 F.2d 509 (6th Cir. 1943)).

The Fund proved that Enivel did more than simply receive rent and instead engaged in literally all pertinent types of activity in its leasing of the East Avenue condominium. JA-106–JA-111. The District Court refused to consider these undisputed facts on the ground that the Fund failed to adduce a lease agreement at trial and that this made Enivel's obligations to tenants "unclear." SPA-16.

But nothing was unclear. Ms. Levine specifically testified that Enivel used a standard residential lease agreement and that Enivel was required to repair anything in the unit that was not the condominium association's responsibility under that agreement. JA-104, JA-110. She admitted hiring maintenance workers and contractors and serving as the contact person for incoming tenant complaints. JA-51, JA-111. The

37

District Court identified these duties and activities as undisputed, expressly finding that Ms. Levine actively (1) negotiated leases for at least two properties and as many as four, (2) researched properties for Enivel to purchase, and (3) maintained or repaired the properties in question. SPA-16. These findings rule out any notion of passive investment.

Additionally, in its analysis of the continuity-and-regularity prong, the District Court found that a showing of how much time Ms. Levine spent per year on real estate activities for Enivel was necessary, and effectively made it a dispositive factor. SPA-16. But real estate leasing by a formal legal entity constitutes a trade or business even if it consumes only a few hours per year because it is this *type* of activity – *not* its frequency or duration – that differentiates it from an investment. *KKB, LLC*, 421 F. Supp. at 73, 76. This case does not involve a person who merely holds stock or merely owns a piece of property – which is a passive investment that logically and correctly does not constitute a trade or business. Rather, this case involves a formally formed and operated business entity that owned real property which it actively marketed for sale, and leased. Thus, the court below

applied the incorrect legal analysis and thereby reached an ultimate conclusion that "is inconsistent with the applicable rule of law … and therefore must be set aside." *Crown Cent. Petroleum Corp. v. Cosmopolitan Shipping Co.*, 602 F.2d 474, 477 (2d Cir. 1979).

## CONCLUSION

For the reasons stated above, the Court should vacate and reverse the district court and remand this case with the instruction to enter judgment in favor of the Fund.

Dated:  October 21, 2014       Respectfully submitted,

SLEVIN & HART, P.C.

By: /s/ *Jeffrey S. Swyers*
Barry S. Slevin, Esq.
Jeffrey S. Swyers, Esq.
Paul E. Knupp, III, Esq.
1625 Massachusetts Ave. NW, Ste.450
Washington, DC 20036
(202) 797-8700

39

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7), because it contains 7,593 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2010 in 14-point Century font.

Dated: October 21, 2014      SLEVIN & HART, P.C.

                                   /s/ *Jeffrey S. Swyers*

                                     *Counsel for Plaintiffs-Appellants*

**SPECIAL APPENDIX**

**TABLE OF CONTENTS**

                                                       **Page**

Decision and Order of the Honorable Glenn T.
   Suddaby, dated June 16, 2014, Appealed From ..... SPA-1

Judgment, dated June 16, 2014, Appealed From ....... SPA-19

SPA-1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UFCW LOCAL ONE PENSION FUND; and
its TRUSTEES,

                              Plaintiffs,

v.                                                                6:11-CV-1144
                                                                  (GTS/ATB)
ENIVEL PROPERTIES, LLC,

                              Defendant.

_____

APPEARANCES:                                      OF COUNSEL:

SLEVIN & HART, P.C.                              JEFFREY S. SWYERS, ESQ.
  Counsel for Plaintiffs                            PAUL E. KNUPP, ESQ.
1625 Massachusetts Avenue, N.W. Suite 450
Washington, D.C. 20036

CULLEY, MARKS, TANENBAUM                  GLENN E. PEZZULO, ESQ.
& PEZZULO, LLP
  Counsel for Defendant
36 West Main Street, Suite 500
Rochester, New York 14614

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

On April 7, 2014, the Court conducted a bench trial in the above-captioned action filed

by the UFCW Local One Pension Fund and its Trustees ("Plaintiffs") against Enivel Properties,

LLC ("Defendant") pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"). At the end of the trial, the Court reserved decision, permitted the filing of post-trial

briefs by June 5, 2014. After carefully considering the matter, the Court finds in favor of

Defendant on Plaintiff's claim, and directs the Clerk of the Court to enter judgment for

Defendant. The following constitutes the Court's findings of fact and conclusions of law in

support of its verdict.

SPA-2

## I.    RELEVANT BACKGROUND

### A.    Plaintiffs' Complaint

Generally, liberally construed, Plaintiffs' Complaint alleges as follows. (Dkt. No. 1.) On or about November 17, 2007, Empire Beef Co., Inc. ("Empire"), a New York corporation and employer, withdrew from the United Food and Commercial Workers Local One Pension Fund (the "Fund"). (*Id*.) As a result of its withdrawal, Empire incurred a withdrawal liability assessment to the Fund in the amount of $1,235,644.00, under ERISA. (*Id*.) Because Enivel Properties, LLC ("Enivel") is another trade or business under common control with Empire, Enivel is jointly and severally liable for this withdrawal liability assessment. (*Id*.) As a result, Plaintiffs seek a judgment against Enivel, awarding Plaintiffs the withdrawal liability assessment, as well as interest, liquidated damages, and fees and costs incurred by the Fund to collect that assessment. (*Id*.) Familiarity with the factual allegations supporting this claim in Plaintiffs' Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id*.)

### B.    Issue for Trial

In their pre-trial stipulations of fact, pre-trial briefs, and post-trial briefs, the parties identify the main, if not sole, legal issue at trial as whether Enivel was a "trade or business" under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1453 (Dkt. No. 40, at 8 [Pre-Trial Stips. of Fact]; Dkt. No. 38 [Def.'s Pre-Trial Brief]; Dkt. No. 41 [Plfs.' Pre-Trial Brief]; Dkt. No. 54 [Plfs.' Post-Trial Brief]; Dkt. No. 53 [Def.'s Post-Trial Brief].)

2

SPA-3

**C.   Facts Established at Trial**

Before trial, the parties jointly submitted pretrial stipulations of fact.  (Dkt. No. 40 [Pre-Trial Stips. of Fact].)  At trial, the testimony of Lori A. Levine was adduced.  (Dkt. No. 52 [Tr. Trans.].)  In addition, the following 17 exhibits were admitted into evidence: (1) Enivel's Operating Agreement, effective May 27, 2003; (2) Enivel's Articles of Organization, filed May 27, 2003; (3) Enivel's Employer Identification Number, issued June 9, 2003; (4) Enivel's income tax returns for 2007; (5) a letter from the Fund to Steven Levine dated January 24, 2008, regarding Empire's withdrawal liability assessment; (6) a letter from Bonadio & Co., LLP to Enivel dated April 5, 2008; (7) a letter from the Fund to Steven Levine dated April 24, 2008, regarding Empire's withdrawal liability assessment; (8) a letter from the Fund to Steven Levine dated July 24, 2008, regarding Empire's withdrawal liability assessment; (9) a Consent Judgment and Order dated September 13, 2011, regarding Empire; (10) a Collective Bargaining Agreement between Empire and United Food and Commercial Workers International Union, effective January 19, 2006; (11) the Fund's Withdrawal Liability Rules, dated March 2005, with subsequent amendments; (12) the Fund's Policy for Collection of Delinquent Contributions, dated December 10, 2002; (13) an excerpt from the New York State Commercial Association of Realtors website, regarding Lori Levine ; (14) another excerpt from the New York State Commercial Association of Realtors website, regarding Lori Levine ; (15) an excerpt from Showcase.com, regarding five of Lori Levine's real property listings; (16) another excerpt from Showcase.com, regarding Lori Levine's Mildahn Road property listing; and (17) another excerpt from Showcase.com, regarding Lori Levine's Ogden Center Road property listing. (Tr. Exs. P-1, P-2, P-3, P-4, P-5, P-6, P-7, P-8, P-10, P-11, P-12, P-13, P-17, P-18, P-19, P-20, P-21, and D-1.)

Generally, based on this evidence, the following facts have been established.

3

SPA-4

1.      **Empire Beef Co., Inc.**

The Fund is a joint labor-management pension fund, which provides retirement and related benefits to the eligible employees of employers who contribute to the Fund pursuant to various collective bargaining agreements with the United Food and Commercial Workers District Union Local One. Until the date of its withdrawal from the Fund in 2007, Empire contributed to the Fund on behalf of its employees covered by a Collective Bargaining Agreement.

On or about November 17, 2007, Empire effected a "complete withdrawal" from the Fund pursuant to ERISA Section 4203(a), 29 U.S.C. § 1383(a).  As a result, Empire incurred a withdrawal liability assessment in the amount of $1,235,644.00.  As of the date of withdrawal, Steven Levine owned 100% of the stock of Empire Beef.

By letter dated January 24, 2008, the Fund sent Empire a Notice and Demand for payment of the withdrawal liability assessment. The Notice and Demand stated that "the withdrawal liability is owed by Empire Beef Company and all trades or businesses under common control." However, Empire did not make the first installment payment due on April 1, 2008. By letter dated April 24, 2008, the Fund notified Empire that, if payment was not received within 60 days from the date of the letter, Empire would be in default as defined by Section 4219(c)(5)(A) of ERISA, 29 U.S.C. § 1399(c)(5)(A). Nonetheless, Empire failed to make any payment. By letter dated July 24, 2008, the Fund notified Empire that it was in default.

Neither Empire nor Enivel initiated arbitration of the withdrawal liability assessment within the time period specified in Section 4221(a)(1) of ERISA, 29 U.S.C. § 1401(a)(1) or at any point thereafter. The Fund filed suit against Empire on February 6, 2009. On September 13, 2011, the Court entered judgment against Empire in the amount of $1,790,343.90, which

4

SPA-5

included the withdrawal liability assessment, interest, liquidated damages, attorneys' fees, and costs. Empire has failed to pay any amounts to the Fund.

### 2.    Enivel Properties, LLC

Enivel is a limited liability company that was formed on May 27, 2003.  At the time of formation (and continuing until 2008), Steven Levine held 40% of the stock of Enivel, and Lori Levine held 60% of the stock of Enivel.  In 2007 or 2008, Steven Levine gifted his shares to his and Lori Levine's children (following his divorce from Ms. Levine).  (Dkt. No. 52, at 5, 12, 14-16, 32 [Tr. Trans.].)

The purpose of Enivel was to serve as a holding company for Steven and Lori Levine's real estate investments.  (Dkt. No. 40, at ¶¶ 11-12 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 11, 14, 16-17, 21, 42 [Tr. Trans.].)  More specifically, Enivel's purpose was to buy properties at one price and later sell them at a higher price, in order to realize a profit.  (Dkt. No. 40, at ¶ 12 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 11 [Tr. Trans.]; *cf.* Tr. Ex. P-1.)  The reason Enivel was formed as a limited liability company was to protect the Levines from legal liability in case somebody was injured on one of their properties.  (Dkt. No. 52, at 16-17, 21 [Tr. Trans.].)

Enivel's Manager, Lori Levine, has been responsible for its business operations.  Apart from performing work for Enivel, Ms. Levine has performed work for Enivel Commercial Realty, a separate entity.  (Dkt. No. 52, at 4-5, 9-10 [Tr. Trans.].)  Ms. Levine was (and is) a licensed real estate broker.

### 3.    Enivel's Pre-Withdrawal Properties

From May 27, 2003, through November 17, 2007, Enivel owned the following three properties: (1) a residential condominium unit located on East Avenue in Rochester, New York (the "East Avenue Condo"); (2) a 5.2-acre parcel of unimproved land located at 392 Mildahn

5

SPA-6

Road in Walworth, New York (the "Mildahn Road Property"); and (3) a 42.0-acre parcel of unimproved land located at 128 Ogden Center Road in Ogden, New York (the "Ogden Center Road Property").

### a.   East Avenue Condo

Enivel purchased the East Avenue Condo in May 2007, and sold the condominium at a loss in 2010 when the local market started deteriorating.  Originally, the condominium was intended to serve was a residence for the Levines' daughter for personal reasons; however, when it was learned that the Levines' daughter would not be residing in the condominium, Enivel held onto the condominium as an investment, and started leasing the condominium periodically to offset the carrying costs (which included condominium association fees, real property taxes, and insurance premiums).  (Dkt. No. 52, at 31-32, 39 [Tr. Trans.]; Dkt. No. 40, at ¶ 15 [Pre-Trial Stips. of Fact].)  Generally, during that three-year period, Enivel leased the condominium to three or four residential tenants who generally responded by telephone to advertisements posted by Lori Levine on Craigslist.  (Dkt. No. 52, at 31-35 [Tr. Trans.].)  One such tenant was obtained through a referral by a prior tenant.  (*Id*. at 37.)  Ms. Levine would typically talk to an applicant on the telephone, show him or her the condominium, have them fill out a standard application form purchased from Staples, call his or her employer to confirm his or her employment, and then have him or her sign a standard lease purchased from Staples; she would not perform a credit check.  (*Id*. at 32, 34-36.)  Ms. Levine determined the amount of rent to charge based on the amounts charged by other landlords for condominiums in the building.  (*Id*. at 36.)  Tenancies consisted of sporadic month-to-month leases with Enivel, and the property was unoccupied approximately 20% of the time during the three-year period.  Enivel held an insurance policy covering the condominium and retained contractors to perform periodic maintenance and upkeep of the property.

6

SPA-7

### b.    Mildahn Road Property

Enivel purchased the Mildahn Road Property in 2004, and thereafter listed it for sale through a third-party real estate broker.  More specifically, Enivel's efforts to sell the Mildahn Road Property have consisted of (1) erecting a sign on the property and telling people about it, (2) listing the property with a brokerage firms, who also erected signs on the property, (3) listing the property with LoopNet.com, (4) listing the property on the Enivel Commercial Realty website "later on," and (5) only recently making  "cold calls" to developers soliciting the sale of the property.  (Dkt. No. 52, at 41-42 [Tr. Trans.]; Tr. Exs. P-19, P-20.)  The property has not been leased.  (Dkt. No. 52, at 43 [Tr. Trans.].)

### c.    Ogden Center Road Property

Enivel purchased the Ogden Center Road Property in 2004.  Enivel holds an insurance policy on the property.  At some point, Enivel started leasing the property to a farmer in order to preserve the erosion of the land, and to offset the tax burden.  (Dkt. No. 52, at 52-53 [Tr. Trans.].)  Eventually, Enivel listed the property on "LoopNet under Enivel Commercial Reality." (*Id*. at 45.)

### 4.    Enivel's Post-Withdrawal Properties

After November 17, 2007, Enivel owned the following three additional properties: (4) a 2.0-acre parcel at 1382 Scottsville Road in Rochester, New York (the "Scottsville Road Property"); (5) a house on West Henrietta Road near Rochester, New York (the "West Henrietta Road Property"); and (6) a condominium in Florida (the "Florida Condo").  (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 29, 46, 53 [Tr. Trans.].)

SPA-8

### a.    Scottsville Road Property

Enivel purchased the Scottsville Road Property in 2008 and sold it at a loss in 2010. (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact]; Dkt. No. 52, at 53 [Tr. Trans.].)  Lori Levine actively searched for a buyer for the Scottsville Road Property because it was a "non-performing asset," meaning that it was incurring real property taxes in excess of its appreciation in value or its revenue.  (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact].)

### b.    West Henrietta Road Property

Enivel purchased the West Henrietta Road Property in 2008, and has since leased it sporadically to residential tenants.   (Dkt. No. 40, at ¶ 18 [Pre-Trial Stips. of Fact].)

### c.    Florida Condo

At some point after 2008, Enivel purchased the Florida Condo, which had been purchased for Lori Levine's father long before 2003.  (Dkt. No. 52-55 [Tr. Trans.].)  At some point in time, the Florida Condo was subsequently sold.  (*Id*. at 54-55.)

### 5.    Enivel Tax Information

Enivel's 2007 New York State Tax Return (which was prepared by a professional accounting firm retained by Enivel) states that the "principal business activity" of Enivel was "Investments."  (Dkt. No. 40, at ¶ 12 [Pre-Trial Stips. of Fact]; Tr. Exs. P-4, D-1.)

In 2007, Enivel reported gross rental income in the amount of $6,055 (from its East Avenue Condo).  (Tr. Exs. P-4, D-1.)  Enivel reported and claimed a deduction for rental real estate expenses of $5,035, which consisted of legal and professional fees, real property taxes, utilities, depreciation and condominium association fees.  (Dkt. No. 40, at ¶ 19 [Pre-Trial Stips. of Fact].)  As a result, Enivel reported $1,020 in net income from residential real estate (which

SPA-9

was attributable to its East Avenue Condo).  (Tr. Exs. P-4, D-1.)  Enivel also reported and

claimed a deduction for real property taxes in the amount of $3,295.  (Dkt. No. 40, at ¶ 19 [Pre-

Trial Stips. of Fact].)  As a result, Enivel reported a net loss in the amount of $2,275.00.  (*Id.*)

## II.      GOVERNING LEGAL STANDARD

ERISA was amended by the MPPAA to provide that trades and businesses under

common control shall be treated as a single, unified employer.  *See* 29 U.S.C. § 1301(b)(1).  As a

result, as indicated by the statute, an entity incurs joint and several liability for withdrawal

liability owed to a pension fund under the MPPAA simply by (1) being a "trade or business" that

is (2) under common control with the withdrawing employer.  *See Corbett v. MacDonald*

*Moving Servs. Inc.*, 124 F.3d 82, 86 (2d Cir. 1997) ("[A]ll businesses under common control are

treated as a single employer for purposes of collecting withdrawal liability, and each is liable for

the withdrawal liability of another."); *Unite Nat'l Ret. Fund v. Veranda Mktg. Co.*, 04-CV-9869,

2009 U.S. Dist. LEXIS 59447, at *11 (S.D.N.Y. July 9, 2009) ("[W]hen withdrawal liability is

imposed on an employer, all other commonly-controlled trades or business are liable as well.").

To satisfy the first requirement of this single-employer rule (i.e., that the entity is a "trade

or business"), the entity must engage in the activity (1) for the primary purpose of income or

profit, and (2) with continuity and regularity.  *Comm'r of Internal Revenue v. Groetzinger*, 480

U.S. 23, 35 (1987) ("We accept the fact that to be engaged in a trade or business, the taxpayer

must be involved in the activity with continuity and regularity and that the taxpayer's primary

purpose for engaging in the activity must be for income or profit.").[1]

---

[1]      With regard to the second requirement of this single-employer rule (i.e., that the
entity is under common control with the withdrawing employer), the Court notes that, in their
briefs, the parties have conceded that the second requirement has been satisfied in this case.  The
Court would add only that, with regard to the second requirement, "no economic nexus is

SPA-10

### A.    Primary-Purpose-of-Income-or-Profit Determination

In making the primary-purpose-of-income-or-profit determination, courts consider the facts and circumstances that distinguish between operating for income or profit and operating for "personal" reasons. *Groetzinger v. Comm'r Internal Revenue*, 771 F.2d 269, 274 (7th Cir. 1985), *aff'd*, 480 U.S. 23 (1987). Such personal reasons include leasing real property to a tenant for the primary purpose of something other than the generation of income or profit. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 643 (7th Cir. 2001) (holding that the renting of apartments above a residential garage was not a "trade or business," even when the owner realized income, where the owner's primary purpose for renting the apartments was the added security from the tenant's presence). Such personal reasons also include holding onto real property as an "investment," where the owner spends a "negligible" amount of time managing any leases. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 878-79 (7th Cir. 2011) ("The[] criteria [set forth in *Groetzinger*] are intended to distinguish a trade or business from investments, hobbies, or amusement diversions. . . . [P]ersonal investments are things like holding shares of stock or bonds in publicly traded corporations. . . . Owning property can be considered a personal investment, at least where the owner spends a negligible amount of time managing the leases . . . .") (internal quotation marks and citations omitted). For example, spending no more than five hours per year managing leases has been held to be such a negligible amount of time. *See Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson,* 238 F.3d 891, 893 (7th Cir. 2001) ("Tom has not devoted more than five

---

required between the obligated organization and trades or businesses under common control because the statute does not impose one." *Cent. States, Se. and Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895, n.1 (7th Cir. 2001).

SPA-11

hours in any year in connection with the properties, and claims that he purchased the properties for investment purposes. According to Tom, he does little more than deposit the rent checks and make mortgage payments, and reports the rental income on Schedule E of his federal income tax forms for supplemental income. . . .").

### B.     Continuity-and-Regularity Determination

In making the continuity-and-regularity determination in cases involving real property, courts consider "activities taken with regard to the property" beyond "mere ownership." *Fulkerson*, 238 F.3d at 895-96.  Such activities include "negotiating leases, researching properties, maintaining or repairing properties, etc." *Id*. at 895.  Moreover, "[w]hen a corporation is the landlord, it is appropriate to consider all the actions taken on behalf of the landlord to fulfill the landlord's duties under the lease . . . ." *Cent. States, Se. & Sw. Areas Pension Fund v. Hughes*, 09-CV-7201, 2012 U.S. Dist. LEXIS 60118, at *20 (N.D. Ill. Apr. 30, 2012).  Depending on the lease, such actions may include the following: (1) "receiving rent checks," "depositing the rent checks and making mortgage payments"; (2) "furnishing information to tax preparers"; (3) "handl[ing] the tenant's requests"; (4) performing "routine repairs and cleaning" on the property, as well as "mowing the grass" and performing "other lawn care activities"; and (5) locating and contacting "contractors or plumbers to do heavier maintenance" and "review[ing] the work once it was completed."  *Hughes*,  2012 U.S. Dist. LEXIS 60118, at *14-15, 21-23.  As for the frequency of the activity, "[a]n activity is operated with regularity if it is operated constantly, continually, steadily, sustainedly, and if it is operated in a methodical way." *Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, LLC*, 421 F. Supp.2d 71, 76 (D. D.C. 2006) (internal quotation marks omitted).

11

SPA-12

### C.    Relevant Time Period

Generally, the most relevant time period for purposes of making this trade-or-business determination is the period *before* the employer withdraws from the pension fund. *See, e.g.,* *McDougall v. Pioneer Ranch L.P.*, 494 F.3d 571, 578 (7th Cir. 2007) (analyzing the business activity of the partnership from 1994, the year it was established, through 2003, the year of the employer's withdrawal); *Fulkerson*, 238 F.3d at 896 (stating that Tom Fulkerson purchased three properties between 1985 and 1987, and later sold two of them in 1990 and 1995, respectively, before making a complete withdrawal in 1998); *Cent. States, Se. and Sw. Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 795 (7th Cir. 1992) (analyzing activity over a span of four years, including two years prior to withdrawal, and one year after for tax return purposes).

This statutory interpretation makes sense, because relying on the period *after* an employer withdraws from a pension fund to determine whether another entity (which was under common control with the employer) was a trade or business would not appear to accomplish the "main purpose" of the single-employer rule, which is "to prevent a business subject to an unfulfilled pension debt from 'fractionalizing its operations' or shifting assets to [already] related companies to avoid meeting its financial obligations to the plan." *Cent. States Se. and Sw. Areas Pension Fund v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993).[2] Indeed, it would appear

---

[2]    The Court notes that it appears that even operations that have been fractionalized must have been trades or businesses *before* the fractionalization. *See Connors v. Incoal, Inc.*, 995 F.2d 245, 251, n.8 (D. D.C. 1993) ("The . . . decision to interpret section 1301(b)(1) only by relying on statutory purpose poses problems of its own. Ultimately, the purpose of section 1301(b)(1)—to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities, . . .—does not take a court very far, because the court must still decide if a particular 'operation' qualifies as a 'trade or business.'") (internal citation and quotation marks omitted); *cf.* S. Rep. No. 383, 93d Cong., 2d Sess. 43, *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4890, 4928 ("The committee . . . intends to make it clear that the coverage and antidiscrimination provisions [of ERISA] cannot be avoided by operating through separate corporations instead of separate branches of one corporation.").

SPA-13

nonsensical to focus on a later time period because the other requirement of the single-employer rule–the existence of a controlled group–"is determined as of the date of the employer's withdrawal from the pension fund." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 881 (7th Cir. 2011); *Nysa-Ila Pension Trust Fund by & Through Capo v. Montague Assocs.*, 94-CV-3604, 1996 U.S. Dist. LEXIS 12278, at *5 (S.D.N.Y. Aug. 21, 1996). Similarly, Empire itself had to be considered an "employer" prior to the withdrawal. *See Canny*, 900 F. Supp. at 592 ("In order to sustain its claim for purposes of summary judgment, plaintiff must establish . . . (1) that defendants constituted an 'employer' under MPPAA *prior* to the withdrawal . . . .") (emphasis added).

## III.    ANALYSIS

### A.    Whether the Primary Purpose of Enivel Was for Income or Profit

After carefully considering the matter, the Court answers this question in the negative for the reasons offered by Defendant in its pre-trial and post-trial briefs. (Dkt. No. 38 [Def.'s Pre-Trial Brief]; Dkt. No. 53 [Def.'s Post-Trial Brief].) The Court would add only four points.

First, the purpose of the East Avenue Condo was originally personal–to serve as a residence for the Levines' daughter for personal health reasons. (No testimony regarding any rent payments by the Levines' daughter was adduced at trial.) When the Levines learned that their daughter would not be residing in the apartment (due to personal health reasons), they decided to hold onto the condominium as an investment. It was only then that Enivel starting leasing the condominium to other tenants in order to offset the carrying costs of the investment.

For the sake of brevity, the Court will set aside the fact that the leasing of the condominium was not designed to generate, nor was it successful in generating, a net income or profit to Enivel. The Court will similarly set aside the fact that Enivel sold the condominium at a

SPA-14

loss.  More important is the fact that insufficient evidence was adduced at trial regarding the number of hours Lori Levine spent per year managing the leasing of the condominium.  (*See generally* Dkt. No. 52 [Tr. Trans.].) *See also, infra,* Part III.B. of this Decision and Order.

Rather, the evidence at trial revealed the following facts regarding Ms. Levine's management of the leasing of the condominium.  The "search" for tenants consisted of postings on Craigslist.  The "background" check of an applicant consisted of a brief telephone call to his or her employer.  The "negotiation" of leases consisted of use of a standard lease purchased from Staples, at a rental rate rather casually adopted from the rates for other condominiums in the building.  During the occupation of the condominium, maintenance was merely "periodic"–a frequency further diminished by the fact that the condominium was unoccupied approximately 20% of the time.  Based on these facts, the Court finds that it would be speculative to conclude that Ms. Levine spent any more than a few hours year managing the leasing of the condominium.  Stated another way, Plaintiffs did not persuade the Court, based on the evidence adduced at trial (and reasonable inferences therefrom), that Ms. Levine spent any more than a few hours per year managing the leasing of the condominium.

Second, the purpose of the Mildahn Road Property appears to have been as a personal investment, since the date of its purchase in 2004.  No evidence was adduced at trial that this property was leased.  It is true that Ms. Levine's efforts to sell the Mildahn Road Property have included (1) informing people of its existence, (2) listing the property with various real estate brokers who erected signs on the property, (3) listing the property with LoopNet.com, and (4) listing the property on the Enivel Commercial Realty website at some subsequent point in time.  However, insufficient evidence was adduced at trial regarding the number of hours Ms. Levine spent per year engaging in these activities.  (*See generally* Dkt. No. 52 [Tr. Trans.].) *See also,*

14

SPA-15

*infra,* Part III.B. of this Decision and Order.  Again, Plaintiff did not persuade the Court that Ms. Levine spent any more than a few hours per year trying to sell the Mildahn Road Property.

Third, the purpose of the Ogden Center Road Property appears to have been as a personal investment, since the date of its purchase in 2004.  It is true that, at some point, Enivel started leasing the property to a farmer to offset ongoing carrying costs such as insurance.   It is also true that Ms. Levine listed the property on LoopNet.com.  However, insufficient evidence was adduced at trial regarding the *extent* of Ms. Levine's efforts to do such things as obtain a tenant and negotiate a lease.  (*See generally* Dkt. No. 52 [Tr. Trans.].) *See also, infra,* Part III.B. of this Decision and Order.  Again, Plaintiff did not persuade the Court that Ms. Levine spent any more than a few hours per year managing the leasing of this 42.0-acre parcel of unimproved land and attempting to sell it.

Fourth, because the most relevant time period for purposes of making this trade-or-business determination is generally the period before the employer withdraws from the pension fund (*see, supra,* Part II.C. of this Decision and Order), the Court need not linger on the properties purchased by Enivel after November 17, 2007.  The Court will merely point out that (1) no evidence was adduced at trial that the Scottsville Road property was ever leased, (2) no evidence was adduced at trial regarding how many hours Ms. Levine spent "sporadically" leasing the West Henrietta Road Property, and (3) the evidence at trial established that the purpose of the Florida Condo was originally to serve as a residence for Ms. Levine's father, and that the condominium was subsequently sold.  Again, based on the evidence adduced at trial, Plaintiff did not persuade the Court that Ms. Levine spent any more than a few hours per year trying to lease, managing, and/or trying to sell these three properties.

For all of these reasons, the Court finds that, while the secondary purpose of Enivel was for income or profit, the *primary* purpose of Enivel was personal.

15

SPA-16

**B.** **Whether Enivel Engaged in Activity for Income or Profit with Continuity and Regularity**

After carefully considering the matter, the Court answers this question in the negative for the reasons offered by Defendant in its pre-trial and post-trial briefs. (Dkt. No. 38 [Def.'s Pre-Trial Brief]; Dkt. No. 53 [Def.'s Post-Trial Brief].) The Court would add only five points.

First, because the Court has already concluded that the primary purpose of Enivel was not income or profit, the Court need to decide this issue (i.e., whether Enivel engaged in income or profit activity with continuity and regularity), and it does so only as an alternative ground for its decision.

Second, as indicated above in Part III.A. of this Decision and Order, it is unclear from the evidence adduced at trial how much time Ms. Levine spent per year (1) negotiating the leases to the East Avenue Condo and the Ogden Center Road Property (or the West Henrietta Road Property and Florida Condo), (2) researching properties for Enivel to purchase, and (3) maintaining or repairing the properties in question.

Third, as for any further obligations imposed on Enivel by the East Avenue Condo and Ogden Center Road Property leases (or the West Henrietta Road Property and Florida Condo leases), it is unclear what those obligations were due to a failure to adduce copies of the relevant leases, or adduce trial testimony sufficiently describing the terms of those leases.

Fourth, even if the Court were to speculate that Enivel possessed a broad range of duties under the relevant leases, insufficient trial evidence was adduced regarding the continuity and regularity with which Enivel did such things as receive rent checks, deposit rent checks, make mortgage payments, furnish information to tax preparers, handle tenant requests, perform routine repairs and cleaning on the properties, moved the grass, performed other lawn care activities,

16

SPA-17

located and contacted contractors, and reviewed their work at the East Avenue Condo and Ogden Center Road Property (or the West Henrietta Road Property and Florida Condo). Rather, the Court is left merely with discrete and vague pieces of testimony regarding property management such as "I told people about [the Mildahn Road property] and that's it . . . I didn't give it much more thought than that," and "I'm sure along the line I had hired somebody outside help [sic] to probably fix or paint something." (Dkt. No. 52, at 42, 38 [Tr. Trans.].) Based on the evidence adduced, the Court is unable to draw the reasonable inferences necessary to render a finding that any income or profit activities engaged in by Enivel were continuous and regular.

Fifth, the Court notes that, in arguing that it *has* shown how much time Ms. Levine spent working for Enivel, Plaintiffs reason as follows: (1) the only way for Ms. Levine to have obtained a real estate broker's license sometime in 2009 was if, before that time, she had either (a) worked full time for two years "as a licensed real estate salesperson," or (b) worked full time for three years in the "general real estate field"; (2) Ms. Levine could not have availed herself of the first form of experience, because she did not become a licensed realtor until sometime in 2008; (3) as a result, she must have availed herself of the second form of experience; (4) indeed, in her application for a real estate broker's license, she relied on her work for Enivel in 2007 to pursue that second form of experience; (4) the New York Department of State Division of Licensing Services must have found that Ms. Levine had worked full time for Enivel in 2007, because it issued her a real estate broker's license at some point in 2009. (Dkt. No. 54, at 8-9 [attaching pages "4" and "5" of Plfs.' Post-Trial Brief].)

For sake of brevity, the Court will assume that the real estate broker's license requirements are as Plaintiffs represent them to be, and not, in the alternative, some sort of

17

SPA-18

*combination* of the two types and durations of work experience stated.  In addition, the Court will not linger on the fact that Plaintiffs, through their argument, seek to either estop Enivel, or deem Ms. Levine to have made an admission, through a determination (which is assumed to have been correct) rendered by a *third party* (i.e., the New York Department of State Division of Licensing Services).

More important, fairly construed, Ms. Levine's brief and temporally-uncertain trial testimony on the subject indicates that she relied only *in part* on her work for Enivel in 2007 when she completed her real estate broker's license.  (*See, e.g.,* Dkt. No. 52, at 5-9 [Tr. Trans].) She was not asked, and thus did not testify, whether she performed work in the general real estate field *other than for Enivel* in 2007.  (*See generally* Dkt. No. 52 [Tr. Trans.].)  Finally, she was not asked, and thus did not testify, regarding the number of hours she worked for Enivel in 2004, 2005 and 2006.  (*Id.*) Those years are particularly important in the present enquiry, given that Enivel purchased both the Mildahn Road Property and Ogden Center Road Property in 2004.

For all of these reasons, the Court finds, in the alternative, that any income or profit activities engaged in by Enivel were not continuous and regular, but were interrupted and/or sporadic.

**ACCORDINGLY**, it is

**ORDERED** that judgment be entered in favor of Defendant and the case be closed.

Dated: June 16, 2014
         Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

SPA-19

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF NEW YORK

### JUDGMENT IN A CIVIL CASE

**UFCW LOCAL ONE PENSION FUND and
its TRUSTEES,**

          Plaintiffs,

     vs.                     **CASE NUMBER: 6:11-cv-1144 (GTS/ATB)**

**ENIVEL PROPERTIES, LLC,**

          Defendant.

[ ]  **Jury Verdict.**     This action came before the Court for a trial by jury. The
issues have been tried and the jury has rendered its verdict.

[X]  **Decision by Court.**  This action came to trial or hearing before the Court.  The
issues have been tried or heard and a decision has been
rendered.

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of the Defendant
Enivel Properties, LLC against UFCW Local One Pension Fund pursuant to the order of
the Honorable Judge Glenn T. Suddaby, dated the 16th day of June, 2014.

DATED:     June 16, 2014

                            Clerk of Court

                            s/ L. Welch
                            Deputy Clerk

SPA-20

## NOTICE TO LITIGANTS

### FILING NOTICE OF APPEAL

This notice is to inform you of the time limitations for filing a Notice of Appeal under Federal Rules of Appellate Procedure 4 (see below) and of the necessity of filing a timely motion for extension with in the thirty-day extension period if the Notice of Appeal is untimely.

Lawrence K. Baerman
Clerk of the Court

*Effective 12/1/11:*

**Rule 4.  Appeal as of Right - When Taken**
  **(a) Appeal in a Civil Case**
    (1) **Time for Filing a Notice of Appeal**.
      (A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4) and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.
      (B) The notice of appeal may be filed by any party within 60 days after the entry of the judgment or order appealed from if one of the parties is:
        (i) the United States;
        (ii) a United States agency;
        (iii) a United States officer or employee sued in an official capacity; or
        (iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf - including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.
      (C) An appeal from an order granting or denying an application for *writ of error coram nobis* is an appeal in a civil case for purposes of Rule 4(a).
    (2) **Filing Before Entry of Judgment**.  A notice of appeal filed after the court announces a decision or order - but before the entry of the judgment or order - is treated as filed on the date of and after the entry.
    (3) **Multiple Appeals**.  If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.
    (4) **Effect of a Motion on a Notice of Appeal**.
      (A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:
        (i) for judgment under Rule 50(b);
        (ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;
        (iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;
        (iv) to alter or amend the judgment under Rule 59;
        (v) for a new trial under Rule 59; or
        (vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

      (B)(i) If a party files a notice of appeal after the court announces or enters a judgment - but before it disposes of any motion listed in Rule 4(a)(4)(A) - the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.
        (ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A) or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal - in compliance with Rule 3(c) - within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.
        (iii) No additional fee is required to file an amended notice.
    (5) **Motion for Extension of Time**.
      (A) The district court may extend the time to file a notice of appeal if:
        (i)  a party so moves no later than 30 days after the time prescribed by this Rule 4 (a) expires; and
        (ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4 (a) expires, that party shows excusable neglect or good cause.
      (B) A motion filed before the expiration of the time prescribed in Rule 4 (a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.
      (C) No extension under this Rule 4 (a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.
    (6) **Reopening the Time to File an Appeal**.  The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:
      (A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;
      (B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and
      (C) the court finds that no party would be prejudiced.

SPA-21

**(7) Entry Defined.**

(A) A judgment or order is entered for purposes of this Rule 4 (a):

(i) if Federal Rule of Civil Procedure 58(a)(1) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

(ii) if Federal Rule of Civil Procedure 58(a)(1) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a)(1) does not affect the validity of an appeal from that judgment or order.

**(b) Appeal in a Criminal Case.**
**(1) Time for Filing a Notice of Appeal.**

(A) In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

(i) the entry of either the judgment or the order being appealed; or

(ii) the filing of the government's notice of appeal.

(B) When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

(i) the entry of the judgment or order being appealed; or

(ii) the filing of a notice of appeal by any defendant.

**(2) Filing Before Entry of Judgment.** A notice of appeal filed after the court announces a decision, sentence, or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

**(3) Effect of a Motion on a Notice of Appeal.**

(A) If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

(i) for judgment of acquittal under Rule 29;

(ii) for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

(iii) for arrest of judgment under Rule 34.

(B) A notice of appeal filed after the court announces a decision, sentence, or order—but before it disposes of any of the motions referred to in Rule 4 (b)(3)(A)—becomes effective upon the later of the following:

(i) the entry of the order disposing of the last such remaining motion; or

(ii) the entry of the judgment of conviction.

(C) A valid notice of appeal is effective—without amendment—to appeal from an order disposing of any of the motions referred to in Rule 4 (b)(3)(A).

**(4) Motion for Extension of Time.** Upon a finding of excusable neglect or good cause, the district court may—before or after the time has expired, with or without motion and notice—extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4 (b).

**(5) Jurisdiction.** The filing of a notice of appeal under this Rule 4 (b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

**(6) Entry Defined.** A judgment or order is entered for purposes of this Rule 4 (b) when it is entered on the criminal docket.

**(c) Appeal by an Inmate Confined in an Institution.**

(1) If an inmate confined in an institution files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing. If an institution has a system designed for legal mail, the inmate must use that system to receive the benefit of this rule. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or by a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

(2) If an inmate files the first notice of appeal in a civil case under this Rule 4 (c), the 14-day period provided in Rule 4 (a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

(3) When a defendant in a criminal case files a notice of appeal under this Rule 4 (c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

**(d) Mistaken Filing in the Court of Appeals.** If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.